# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs March 25, 2015

## JAMES DELLINGER v. STATE OF TENNESSEE

### Appeal from the Circuit Court for Blount County
### No. C14432    David Reed Duggan, Judge

---

### No. E2013-02094-CCA-R3-ECN – Filed August 18, 2015

---

The Petitioner, James Dellinger, appeals from the trial court's denial of his petition for a writ of error coram nobis, his petition for a writ of audita querela, his motion for a declaratory judgment, his claims pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and his claims under the due process, law of the land, and open courts provisions of the United States and Tennessee Constitutions. The Petitioner seeks relief from his conviction for first degree murder and his resulting death sentence, claiming that he is ineligible for the death penalty because he is intellectually disabled and that his conviction violates principles of double jeopardy. We affirm the judgment of the trial court.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT L. HOLLOWAY, JR., JJ., joined.

Amy Dawn Harwell and Michael J. Passino, Assistant Federal Public Defenders, Nashville, Tennessee, for the appellant, James Dellinger.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Counsel; Mike Flynn, District Attorney General; and Kenlyn Foster, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

In February 1992, the Petitioner and his codefendant, Gary Wayne Sutton, killed Tommy Mayford Griffin in Blount County by shooting him with a shotgun. *See State v. Dellinger*, 79 S.W.3d 458, 462-65 (Tenn. 2002). Shortly thereafter, the Petitioner and Sutton killed Connie Branam, Mr. Griffin's sister, who had been searching for her

missing brother. *Id.* at 464-65. Ms. Branam's body was discovered in her burned vehicle in a wooded area in Sevier County. *Id.*

The Petitioner and Sutton were charged in Blount County with first degree premeditated murder of Mr. Griffin. They were charged in Sevier County with first degree premeditated murder of Ms. Branam and the burning of personal property. The Sevier County case proceeded to trial first, and the Petitioner and Sutton were convicted of the charges. They each received a life sentence for the first degree murder conviction and a consecutive two-year sentence for the burning of personal property conviction. Their convictions and sentences were affirmed on appeal. *See State v. Gary Wayne Sutton and James Anderson Dellinger*, No. 03C01-9403-CR-0090, 1995 WL 406953, at *1 (Tenn. Crim. App. July 11, 1995), *perm. app. denied* (Tenn. Jan. 22, 1996).

Following their convictions in Sevier County, the Petitioner and Sutton were tried and convicted in Blount County for first degree murder of Mr. Griffin. The State sought the death penalty for both the Petitioner and Sutton based upon one aggravating circumstance: the Petitioner and Sutton were each previously convicted of one or more violent felonies. *See* T.C.A. § 39-13-204(i)(2) (1991). The State relied upon the prior first degree murder conviction relative to Ms. Branam in establishing this aggravating circumstance.[1] *See Dellinger*, 79 S.W.3d at 465.

During the penalty phase, the Petitioner presented the following evidence in mitigation:

Dellinger presented proof that he was raised in a large family with eight children. His parents were loving but were harsh disciplinarians, and his family was very poor. Dellinger left school when he was ten years old and never learned to read or write. He became a carpenter, and testimony showed that he was a good employee until 1990 when he sustained a back injury that forced him to quit working. Dellinger has four children and two stepchildren from his two marriages. Two of his children had died tragically—an eighteen-year-old daughter died in a car accident, and a fifteen-month-old son died when a stove fell on him. Dellinger presented evidence that he is a non-violent, religious, helpful, and kind-hearted man. He had been a well-behaved prisoner and had prevented another prisoner from committing suicide. Clinical psychologist Dr. Peter Young testified that Dellinger has an IQ between 72 and 83 and has borderline personality disorder. He related that due to a lack of family nurturing Dellinger is distrustful of others. Young testified that although Dellinger is not violent

---

[1] The State also presented evidence that Sutton was convicted of aggravated assault in Cobb County, Georgia in 1983. *See Dellinger*, 79 S.W.3d at 465.

he is capable of "flaring up" when drunk and angry. Young opined that Dellinger would do well in a structured prison environment.

*Id.* At the conclusion of the penalty phase, the jury sentenced the Petitioner and Sutton to death. The Tennessee Supreme Court upheld their convictions and sentences on appeal. *See id.* at 462.

## Post-Conviction Proceedings

On March 3, 2003, the Petitioner filed a pro se petition for post-conviction relief challenging his conviction for first degree murder of Mr. Griffin and his death sentence. Following the appointment of counsel, the Petitioner filed an amended petition on August 11, 2003. The Petitioner raised numerous claims in his amended petition, including that he was ineligible for the death penalty due to his intellectual disability and that his trial attorneys were ineffective in failing to develop evidence of his intellectual disability. On October 27 and 28, 2004, the Petitioner filed amendments to his amended petition. An evidentiary hearing was held on October 26-29, 2004, and on January 28, 2005.

During the hearing, the Petitioner presented the testimony of Dr. Peggy Joyce Cantrell, an expert in clinical psychology and the psychology of rural Appalachia. In evaluating the Petitioner, Dr. Cantrell reviewed Dr. Young's report and raw data from 1995, the psychological evaluation by Middle Tennessee Mental Health Institute in 1993, and Dr. Diana McCoy's report from a 1992 evaluation. Dr. Cantrell interviewed the Petitioner, his wife, and one of his sisters. Dr. Cantrell reviewed the transcript of the penalty phase of the trial and eleven interview summaries of the Petitioner's family members and friends conducted in 2003.

Dr. Cantrell testified regarding the Petitioner's family history of extreme poverty, his lack of education, his history of alcohol abuse that began at a young age, his employment history, his marriage and relationship with his wife, and the deaths of two of his children. Dr. Cantrell stated that the Petitioner had deficits in the cognitive, emotional, and interpersonal areas. Dr. Cantrell noted that the Petitioner previously had taken two or three IQ tests. She described the Petitioner's scores on the tests as "very consistent in the borderline to lower end of the low average range of intelligence, with his verbal skills being less well developed." Dr. Cantrell noted the Petitioner had significant verbal reasoning deficits. She said that the Petitioner was essentially illiterate and that his scores on academic testing fell within the first or second grade level. Dr. Cantrell also said that the Petitioner lacked full personality development and that he would find forming and sustaining close relationships difficult. Dr. Cantrell testified that while the Petitioner had cognitive limitations, the limitations were not "to the degree where he's [intellectually disabled], by any means."

On June 2, 2005, the post-conviction court entered an order denying the Petitioner relief. Relative to the Petitioner's claims relating to intellectual disability, the court noted Dr. Cantrell's testimony that the Petitioner was not intellectually disabled. On appeal, the Petitioner did not pursue any claims of intellectual disability. The Tennessee Supreme Court affirmed the post-conviction court's denial of post-conviction relief. *See Dellinger v. State*, 279 S.W.3d 282, 285-86 (Tenn. 2009).

## Subsequent Proceedings

On April 10, 2012, the Petitioner filed a motion to reopen the post-conviction proceedings. In the original and amended motions, the Petitioner claimed that he was "actually innocent of the death penalty" because of new scientific evidence establishing his intellectual disability based upon a new rule of constitutional law provided in *Coleman v. State*, 341 S.W.3d 221 (Tenn. 2011). The Petitioner also alleged that he was "actually innocent of the death penalty" because his death sentence violated principles of double jeopardy because a Sevier County jury declined to impose the death penalty for the murder of Ms. Branam and the State successfully sought the death penalty in Blount County using the Sevier County conviction as an aggravating circumstance.

In support of his intellectual disabilty claim, the Petitioner attached to his motion the February 17, 2012 affidavit of Dr. Dale G. Watson, a clinical psychologist from California who specialized in neuropsychology and neuropsychological assessments. The Petitioner also attached Dr. Watson's report of his December 13, 2010 evaluation. According to Dr. Watson's 2010 report, he evaluated the Petitioner on September 15, 16, and 17, 2010. Dr. Watson interviewed the Petitioner, administered multiple tests, and reviewed prior evaluations. Dr. Watson described the Petitioner's family, education, medical, substance abuse, and employment histories.

Dr. Watson concluded that the Petitioner had significant dysfunction within the left hemispshere of his brain. Dr. Watson found that the brain dysfunction impacted the Petitioner's overall intellectual capacity, capacity to focus, memory, executive functions, and ability to problem solve and perform academic tasks. According to Dr. Watson, "[t]he severity of his impairments is of at least a moderate intensity, which is sufficient to cause significant problems in his day-to-day life." In reviewing Dr. Young's pre-trial evaluation of the Petitioner, Dr. Watson noted that Dr. Young also found brain dysfunction within the left hemisphere of the Petitioner's brain.

Dr. Watson reviewed the results of multiple IQ tests that had been administered to the Petitioner. The Petitioner was administered the Weschler Adult Intelligence Scale-Revised (WAIS-R) in December 1991, December 1992, and September 1993; the Revised Beta II (Beta-II) in April 1993; and the Woodcock Johnson by Dr. Young in

March 1995. Dr. Watson administered the Weschler Adult Intelligence Scale, Fourth Edition (WAIS-IV) to the Petitioner in September 2010. Dr. Watson adjusted the Petitioner's IQ scores based upon the Flynn Effect[2] and considered whether the scores were affected by the practice effect.[3] Dr. Watson detailed his results as follows:

| Instrument | Date Administered | Full-Scale IQ Score | Flynn Adjusted IQ | Practice Effect Present |
|---|---|---|---|---|
| WAIS-R | 12/30/1991 | 79 | 75 | No |
| WAIS-R | 12/7/1992 | 89 | 85 | Yes |
| Beta-II | 4/1/1993 | 72 | 66 | No |
| WAIS-R | 9/15/1993 | 83 | 78 | Yes |
| Woodcock Johnson | 3/29/1995 | 72 | 70 | No |
| WAIS-IV | 9/15/2010 | 69 | 68 | No |

Dr. Watson stated that the examinations impacted by the practice effect consistently showed higher results and that he did not consider them reliable measures of the Petitioner's intellectual capacity. Dr. Watson noted that the Beta-II was not a comprehensive measure of intellectual functioning. He then considered the remaining "Flynn-Adjusted" scores of 68 in 2010, 70 in 1995, and 75 in 1991. He concluded that the Petitioner's true IQ was between 66 and 74 when the standard error of estimate (SEE) was applied. The Petitioner's IQ was between 65 and 73 when the standard error of measurement (SEM) was applied.[4] Dr. Watson concluded that the Petitioner satisfied the first criteria for intellectual disability in that "his general intellectual functioning [was] significantly subaverage."

Dr. Watson also concluded that the Petitioner satisfied the second criteria of intellectual disability in that he had "significant limitations in adaptive functioning." Dr. Watson did not complete a formal assessment of adaptive functioning but relied, in part, upon the assessment of Dr. Stephen Greenspan, who concluded that the Petitioner had adaptive functional deficits in language, communication, employment, and academic

[2] "The Flynn Effect refers to the observed phenomenon that IQ test scores tend to increase over time. Thus, the most current versions of a test should be used at all times and, when older versions of the test are used, the scores must be correspondingly adjusted downward." *Coleman*, 341 S.W.3d at 242 n.55 (citing AAIDD Manual, at 37).

[3] "The practice effect refers to increases in IQ test scores that result from a person's being retested using the same or a similar instrument." *Coleman*, 341 S.W.3d at 242 n.55 (citing AAIDD Manual, at 38).

[4] According to Dr. Watson, confidence intervals calculated under the SEM are based upon observed scores, while confidence intervals calculated under the SEE are based upon "the estimated true score corrected for regression toward the mean."

skills. Dr. Watson stated that his neuropsychological evaluation of the Petitioner confirmed deficits in functional academic skills and language-based communications.

Finally, Dr. Watson concluded that the Petitioner's "deficits [were] life-long and both developed and manifested during the developmental period, before the age of 18." As a result, Dr. Watson opined that the Petitioner was intellectually disabled.

Dr. Watson did not conduct an additional evaluation of the Petitioner prior to preparing his February 2012 affidavit. Dr. Watson stated in his affidavit that the Petitioner's counsel requested that he provide additional analysis in light of the Tennessee Supreme Court's decision in *Coleman*, as well as additional information that he received regarding the Petitioner's psychosocial history. This additional information included declarations by the Petitioner's siblings, the siblings' school records, the Petitioner's children's school records, his son's birth records, and a psychological evaluation of his son.

In determining the Petitioner's functional IQ, Dr. Watson considered the SEM, the practice effect, the Flynn Effect, his clinical judgment, the exchangeability of IQ scores, and the correlation among the tests administered. Dr. Watson again determined that the most reliable IQ scores were 79 on the WAIS-R in 1991, 72 on the Woodcock Johnson administered by Dr. Young in 1995, and 69 on the WAIS-IV administered by Dr. Watson in 2010. When adjusted for the Flynn Effect, the IQ scores were 75, 70, and 68, respectively. Dr. Watson stated that when the correlations among the three tests were considered, the Petitioner's functional IQ was either 68 or 69. Dr. Watson concluded that the Petitioner's actual IQ was below 70 and that he met the first criteria of intellectual disability.

In accordance with his prior evaluation, Dr. Watson found that the Petitioner satisfied the second criteria of intellectual disability relative to deficits in adaptive functioning. He further found that the onset of intellectual and adaptive functioning deficits occurred during the developmental period and prior to the age of eighteen. Dr. Watson, therefore, concluded that the Petitioner was intellectually disabled.

The Petitioner also attached to his motion psychologist Stephen Greenspan's February 7, 2012 affidavit. Dr. Greenspan stated that in November 2010, he issued a report of his evaluation of the Petitioner related to an issue in federal court regarding equitable tolling of a filing deadline. Dr. Greenspan also stated that while he mentioned intellectual disability in his report, it was not the central focus of the report. Dr. Greenspan was asked to revisit the intellectual disability issue and consider additional materials that were provided to him after he issued his original November 2010 report.

Dr. Greenspan stated in his earlier report that he believed the Petitioner was "right at the cusp of the [intellectual disability] category, and whether or not he qualifies for that diagnosis depends on how rigidly or flexibly one interprets the IQ cutoff." Dr. Greenspan noted, "Currently, Tennessee is one of a small number of states which uses a bright line IQ ceiling of 70 points." Following the Tennessee Supreme Court's opinion in *Coleman*, Dr. Greenspan revised his earlier conclusion and determined that the Petititioner satisfied the criteria for intellectual disability.

Dr. Greenspan concluded that the Petitioner had significantly subaverage intelligence, as evidenced by a functional IQ of 70 or below. Dr. Greenspan's basis for his conclusion mirrored that of Dr. Watson. Dr. Greenspan stated that the Petitioner's score on the WAIS-IV administered by Dr. Watson appeared to be the most reliable indicator of the Petitioner's functional IQ. In reaching his conclusion, Dr. Greenspan also considered results of testing indicating that the Petitioner had "significant language deficits that [were] quite severe in nature."

Dr. Greenspan concluded that the Petitioner had deficits in adaptive behavior. He based his conclusion upon his November 2010 interviews of the Petitioner's first wife and a former employer and upon a structured interview with the Petitioner. Dr. Greenspan also concluded that the Petitioner's intellectual disability manifested during the developmental period or by the age of eighteen.

On December 20, 2012, the Tennessee Supreme Court released its opinion in *Keen v. State*, 398 S.W.3d 594 (Tenn. 2012), in which the court rejected the intellectual disability claims upon which the Petitioner sought to reopen his post-conviction proceedings. On February 6, 2013, the Petitioner amended his motion to include a petition for a writ of error coram nobis; a common law writ of audita querela; a motion for a declaratory judgment; claims under the law of the land, due process, and open courts clauses; and "*Bivens*-like" claims. The State filed a response seeking summary dismissal and maintaining that the coram nobis petition was time barred. Following a hearing, the trial court dismissed the Petitioner's pleading.

The Petitioner sought appellate review of the trial court's denial of his motion to reopen his post-conviction proceedings pursuant to Tennessee Supreme Court Rule 28. On January 16, 2014, this court denied the Petitioner's application for permission to appeal. *See James Dellinger v. State*, E2013-02079-CCA-R28-PD (Tenn. Crim. App. Jan. 16, 2014) (order), *perm. app. denied* (Tenn. May 15, 2014). The Petitioner conceded that *Keen* controlled his claim pursuant to Tennessee Code Annotated section 40-30-117(a)(2) that he had new scientific evidence establishing that he was intellectually disabled and, therefore, "actually innocent" of first degree murder and entitled to reopen his post-conviction proceedings. *Id.* at *2; *see* T.C.A. § 40-30-117(a)(2) (2014)

(authorizing the reopening of post-conviction proceedings if the claim "is based upon new scientific evidence establishing that the petitioner is actually innocent of the offense or offenses for which the petitioner was convicted"). The Petitioner also conceded that *Keen* controlled his claim that *Coleman* established a new constitutional right requiring retrospective application. *James Dellinger*, E2013-02079-CCA-R28-PD, at *2. The Petitioner argued that due process considerations required tolling the timely presentation of his intellectual disability claim. *Id.* This court noted that in *Whitehead v. State*, 402 S.W.3d 615 (Tenn. 2013), the Tennessee Supreme Court held that due process required tolling the statute of limitations when a petitioner diligently pursued his rights under the Post-Conviction Procedure Act but failed to file a timely petition due to attorney misrepresentation or misconduct beyond a petitioner's control. *Id.* at *2-3. This court noted that unlike the petitioner in *Whitehead*, the Petitioner was not prevented from filing a post-conviction petition as a result of attorney misrepresentation or misconduct. *Id.* at *3. Rather, the Petitioner raised a claim in his post-conviction petition that intellectual disability precluded the imposition of the death sentence. *Id.*

This court also rejected the Petitioner's argument that post-conviction counsel's failure to competently pursue and present the claim during the original post-conviction proceedings warranted due process tolling. *Id.* This court stated that a petitioner does not have a right to the effective assistance of counsel in post-conviction proceedings. *Id.* Accordingly, this court denied the Petitioner's application for permission to appeal the trial court's dismissal of his motion to reopen. *Id.* The Petitioner also filed a notice of appeal pursuant to Tennessee Appellate Procedure Rule 3 regarding the trial court's dismissal of his remaining claims.

## ANALYSIS

## I. WRIT OF ERROR CORAM NOBIS

The Petitioner contends that the trial court erred in denying his petition for a writ of error coram nobis with regard to his intellectual disablity claim. A writ of error coram nobis is an "*extraordinary* procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999) (citation omitted) (emphasis in original). Tennessee Code Annotated section 40-26-105(b) (2012) provides that coram nobis relief is available in criminal cases as follows:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to

present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Unlike the grounds for reopening a post-conviction petition, the grounds for seeking a writ of error coram nobis are not limited to specific categories. *Harris v. State*, 102 S.W.3d 587, 592 (Tenn. 2003). Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at trial" so long as the petitioner establishes that he or she was "without fault in failing to present the evidence at the proper time." *Id.* at 592-93. In a coram nobis proceeding, the trial court first must consider the newly discovered evidence and be "reasonably well satisfied with its veracity." *State v. Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007). If the defendant is without fault because the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial court must examine both the evidence presented at the trial and during the coram nobis proceedings to determine whether the new evidence may have led to a different result. *Id.* The decision to grant or deny coram nobis relief rests within the sound discretion of the trial court. *Id.* at 527-28.

## A. Intellectual Disability and the Death Penalty

Enacted in 1990, Tennessee Code Annotated section 39-13-203 prohibits the execution of defendants who were intellectually disabled at the time they committed first degree murder. *See* T.C.A. § 39-13-203(b) (2014); *Howell v. State*, 151 S.W.3d 450, 455 (Tenn. 2004); *State v. Van Tran*, 66 S.W.3d 790, 796 (Tenn. 2001). Although the statute does not have retroactive application, the United States Supreme Court and the Tennessee Supreme Court have held that the execution of intellectually disabled individuals violates constitutional prohibitions against cruel and unusual punishment. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002); *Van Tran*, 66 S.W.3d at 798-99.

In Tennessee, "intellectual disabilty" rendering a defendant ineligible for the death penalty requires:

(1) Significantly subaverage general intellectual functioning as evidence by a functional intelligence quotient (I.Q.) of seventy of below;
(2) Deficits in adaptive behavior; and
(3) The intellectual disability must have manifested during the developmental period, or by eighteen (18) years of age.

T.C.A. § 39-13-203(a). All three prongs must be satisfied to establish intellectual disability. The defendant has the burden of establishing intellectual disability by a preponderance of the evidence. *See id.* at (c); *Howell*, 151 S.W.3d at 465.

In 2004, the Tennessee Supreme Court concluded that the demarcation of an IQ of 70 was a "bright-line" rule that must be satisfied. *Howell*, 151 S.W.3d at 456-59. In 2011, the Tennessee Supreme Court concluded that although an individual's IQ is genenerally obtained through standardized intelligence tests, Code section 39-13-203 does not specify the manner in which an IQ should be determined or the particular test or testing method that should be utilized. *Coleman v. State*, 341 S.W.3d 221, 241 (Tenn. 2011). Noting that Code section 39-13-203(a)(1) only requires a "functional intelligence quotient" of 70 or below and not a "function intelligence quotient *test score*" of 70 or below, the court held that "trial courts may receive and consider any relevant and admissible evidence regarding whether the defendant's functional I.Q. at the time of the offense was seventy (70) or below." *Coleman*, 341 S.W.3d at 241 (emphasis in original). Unlike clinical practice, Code section 39-13-203(a)(1) prohibits the expression of a defendant's IQ within a range. *Id.* at 242, 247. Rather, the expert's opinion "must be expressed specifically (i.e., that the defendant's IQ is 75 or is 'seventy (70) or below' or is above 70)." *Id.* at 242.

In formulating an opinion regarding a defendant's functional IQ, experts may rely upon relevant and reliable practices, methods, standards, and data. *Id.* Moreover,

> if the trial court determines that professionals who assess a person's I.Q. customarily consider a particular test's standard error of measurement, the Flynn Effect, the practice effect, or other factors affecting the accuracy, reliability, or fairness of the instrument or instruments used to assess or measure the defendant's I.Q., an expert should be permitted to base his or her assessment of the defendant's "functional intelligence quotient" on a consideration of those factors.

*Id.* at n.55. The emphasis to be placed upon clinical judgment varies depending upon "the type and amount of information available, the complexity of the issue, and the presence of one or more challenging conditions or situations." *Id.* at 246. The trial court is not required to follow any particular expert's opinion but must fully and fairly consider all evidence presented, including the results of all I.Q. tests administered to the defendant. *Id.* at 242.

The Tennessee Supreme Court in *Keen v. State* addressed whether a petitioner sentenced to death may allege intellectual disability as a basis for reopening post-conviction proceedings. The petitioner in *Keen* sought to reopen post-conviction

proceedings, claiming new scientific evidence of actual innocence. *Keen*, 398 S.W.3d at 598. This new evidence was a newly-obtained IQ score of 67, which the petitioner claimed established that he was intellectually disabled and, therefore, "actually innocent" of first degree murder. *Id.* The petitioner also argued that *Coleman* established a new rule of constitutional law that should be applied retroactively. *Id.* at 599. Our supreme court rejected both arguments. The court held that *Coleman* addressed the interpretation and application of Tennessee Code Annotated section 39-13-203 and was not a constitutional ruling. *Id.* at 609. The court also held that "a claim alleging ineligibility for the death penalty does not qualify as an actual innocence claim[.]" *Id.* at 613. While remaining "committed to the principle that Tennessee has no business executing persons who are intellectually disabled," the court held that the petitioner failed to meet the requirements for reopening his post-conviction proceedings. *Id.*

In addressing its holdings in *Howell* and *Coleman*, our supreme court noted:

Regrettably, several courts misconstrued our holding in *Howell* that Tenn. Code Ann. § 39-13-203(a)(1) established a "bright line rule" for determining intellectual disability. They understood this language to mean that courts could consider *only* raw I.Q. scores. Accordingly, these courts tended to disregard any evidence suggesting that raw scores could paint an inaccurate picture of a defendant's actual intellectual functioning. This was an inaccurate reading of *Howell*, in which we took pains to say that the trial court should "giv[e] full and fair consideration to all tests administered to the petitioner" and should "fully analyz[e] and consider[ ] all evidence presented" concerning the petitioner's I.Q.

*Id.* at 603 (citations omitted) (emphais in original). The petitioner requested that the supreme court remand his case for a new hearing on the issue of intellectual disability, just as the court had done in *Coleman*, 341 S.W.3d at 252-53, and in *Smith v. State*, 357 S.W.3d 322, 354-55 (Tenn. 2011). *See Keen*, 398 S.W.3d at 613. The court, however, rejected the petitioner's request and noted that unlike the petitioner, the petitioners in *Coleman* and *Smith* took advantage of the one-year window for seeking relief following the recognition of the constitutional prohibition against executing intellectual disabled defendants in *Van Tran* and *Atkins*. *Id*. The petitioner failed to avail himself of that opportunity. *Id.*

## B. Analysis

A writ of error coram nobis lies "for subsequently or newly discovered evidence relating to matters which were not litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial."

T.C.A. § 40–26–105(b) (2012); *State v. Hart*, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995); *see Cole v. State*, 589 S.W.2d 941 (Tenn. Crim. App. 1979). The purpose of a coram nobis proceeding "is to bring to the attention of the court some fact unknown to the court, which if known would have resulted in a different judgment." *State ex rel. Carlson v. State*, 407 S.W.2d 165, 167 (Tenn. 1966). The decision to grant or deny such a writ rests within the sound discretion of the court. *Jones v. State*, 519 S.W.2d 398, 400 (Tenn. Crim. App. 1974); *see Teague v. State*, 772 S.W.2d 915, 921 (Tenn. Crim. App. 1988). A petition for a writ of coram nobis must be filed within one year of the judgment becoming final in the trial court. *State v. Mixon*, 983 S.W.2d 661, 670 (Tenn. 1999). A judgment becomes final "thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion." *Harris v. State*, 301 S.W.3d 141, 144 (Tenn. 2010). A limited exception to the statute of limitations exists when due process requires tolling. *Workman v. State*, 41 S.W.3d 100, 103 (Tenn. 2001).

"When a petitioner seeks a writ of error coram nobis based on newly discovered evidence of actual innocence, due process considerations may require tolling of the statute of limitations." *Harris*, 301 S.W.3d at 145 (citing *Workman*, 41 S.W.3d at 101). "[B]efore a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." *Burford v. State*, 845 S.W.2d 204, 208 (Tenn. 1992); *see Workman*, 41 S.W.3d at 102. However, a petitioner "must exercise due diligence in presenting the claim." *Harris*, 301 S.W.3d at 144. Whether due process principles require tolling the statute of limitations is a mixed question of law and fact and is reviewed de novo with no presumption of correctness. *See Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006).

Relative to due process tolling, the Tennessee Supreme Court has prescribed a three-part analysis whereby the coram nobis court must

> (1) determine when the limitations period would normally have begun to run; (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim. In making this final determination, courts should carefully weigh the petitioner's liberty interest in "collaterally attacking constitutional violations occurring during the conviction process," *Burford*, 845 S.W.2d at 207, against the State's

interest in preventing the litigation of "stale and fraudulent claims." *Id.* at 208.

*Sands v. State*, 903 S.W.2d 297, 301 (Tenn. 1995) (footnote omitted).

In the present case, the limitations period for seeking coram nobis relief generally would have begun following the Petitioner's trial in 1996. The Petitioner filed his petition for a writ of error coram nobis on February 6, 2013, more than fifteen years after the one-year statutue of limitations expired.

The Petitioner contends that he is entitled to due process tolling of the statute of limitations. We note that the Petitioner raised the issue of intellectual disability in a limited manner before his trial and during the post-conviction proceedings.

While the execution of intellectually disabled defendants was not constitutionally prohibited at the time of the Petitioner's trial in 1996, it was prohibited by Tennessee Code Annotated section 39-13-203. *See Van Tran*, 66 S.W.3d at 798-99. The Petitioner raised an intellectual disability issue before the trial when he and his codefendant filed a motion seeking IQ testing while under the influence of alcohol. *State v. James Henderson Dellinger and Gary Wayne Sutton*, No. E1997-00196-CCA-R3-DD, 2001 WL 220186, at *16 (Tenn. Crim. App. Mar. 7, 2001) *aff'd*, 79 S.W.3d 458 (Tenn. 2002). They argued that their consumption of alcohol before the killing may have lowered their IQ levels below 70, rendering them statutorily ineligible for the death penalty. *Id.* Following an evidentiary hearing, the trial court found no evidence showed alcohol consumption had any effect on IQ levels and that no recognized test existed for measuring a person's IQ level while intoxicated. *Id.* The trial court also found that the Petitioner and his co-defendant failed to establish that they had deficits in adaptive behavior or that they had an intellectual disability that manifested itself during the developmental period or by the age of eighteen. *Id.*

On appeal, the Petitioner and his codefendant abandoned their intellectual disability claim but maintained that their IQ levels while intoxicated were relevant to the issues of intent and premeditation. *Id.* This court rejected the argument and upheld the trial court's findings that alcohol consumption did not effect IQ levels and that no recognized test existed for determining the IQ level of an intoxicated person. *Id.* Because the Petitioner did not raise an intellectual disability issue on appeal, this court did not address the trial court's findings related to deficits in adaptive behavior and its manifestation during the developmental period.

In 2001, the Tennessee Supreme Court recognized that the execution of intellectually disabled defendants is constitutionally prohibited. *See Van Tran*, 66 S.W.3d at 798-99. The Petitioner raised a claim of intellectual disability in his amended petition for post-conviction relief. During the evidentiary hearing, he presented the testimony of Dr. Cantrell, who did not conclude that the Petitioner was intellectually disabled. The post-conviction court denied the Petitioner's intellectual disability claim, and the Petitioner did not raise an intellectual disability claim on appeal.

The Petitioner maintains that the reports of Drs. Watson and Greenspan were "newly available" evidence that did not become available until after the trial concluded. The Petitioner acknowledges that his intellectual disability existed prior to the trial. He argues, however, that circumstances beyond his control prevented him from presenting such evidence. According to the Petitioner, evidence of his intellectual disability first became available following our supreme court's opinion in *Coleman*.

Generally, evidence must not have been known to the defendant at the time of trial to qualify as newly discovered evidence. *Wlodarz v. State*, 361 S.W.3d 490, 506 (Tenn. 2012). A narrow exception exists where "'although not newly discovered evidence, in the usual sense of the term,' the '*availability*' of the evidence 'is newly discovered.'" *Harris*, 301 S.W.3d at 160-61 (Koch, J., concurring) (quoting *Taylor v. State*, 171 S.W.2d 403, 405 (Tenn. 1943)); *see David G. Housler, Jr. v. State*, No. M2010-02183-CCA-R3-PC, 2013 WL 5232344, at *44 (Tenn. Crim. App. Sept. 17, 2013).

This narrow exception has been applied where previously unavailable evidence became available following a change in factual circumstances. *See, e.g., Taylor*, 171 S.W.2d at 405 (applying the exception when at the time of the trial, one witness was hospitalized and another was working outside the state, and they later became available to testify); *Misty Jane Brunelle v. State*, No. E2010-00662-CCA-R3-PC, 2011 WL 2436545, at *10 (Tenn. Crim. App. June 16, 2011), *perm. app. denied* (Tenn. Oct. 18, 2011) (noting that the petitioner should have sought coram nobis relief when a DCS report known to the petitioner but sealed at the time of trial later became available). Other cases applying this exception involved testimony of a codefendant or a witness who previously refused to testify by asserting the constitutional privilege against self-incrimination. *See, e.g., David G. Housler, Jr.*, 2013 WL 5232344, at *44; *United States v. Guillette*, 404 F. Supp. 1360, 1372-74 (D.C. Conn. 1975); *Brantley v. State*, 912 So.2d 342, 343 (Fla. App. 2005); *State v. Williams*, 246 So.2d 4, 6 (La. 1971); *Commonwealth v. Brown*, 431 A.2d 343, 344 (Pa. Super. Ct. 1981); *State v. Gerdes*, 258 N.W.2d 839, 843 (S.D. 1977).

The Petitioner has not cited to any authority applying this narrow unavailability exception based upon a change in the law. "Issues regarding whether a change in the law should apply post-trial related to retroactivity and are more properly addressed in post-conviction proceedings or a motion to reopen post-conviction proceedings." *Vincent Sims v. State*, No. W2014-00166-CCA-R3-PD, 2014 WL 7334202, at *10 (Tenn. Crim. App. Dec. 23, 2014), *perm. app. denied* (Tenn. May 18, 2015); *Tyrone Chalmers v. State*, No. W2013-02317-CCA-R3-PD, 2014 WL 2993863, at *9 (Tenn. Crim. App. June 30, 2014), *perm. app. denied* (Tenn. Nov. 19, 2014); *Dennis Wade Suttles v. State*, No. E2013-01016-CCA-R3-PD, 2014 WL 2902271, at *15 (Tenn. Crim. App. June 25, 2014), *perm. app. denied* (Tenn. Nov. 21, 2014). Even if the unavailability exception applies to a change in law, the Petitioner is not entitled to relief.

The Petitioner argues that following *Howell* and prior to *Coleman*, courts could consider only raw IQ scores in determining intellectual disability pursuant to Tennessee Code Annotated section 39-13-203(a)(1). In *Keen*, however, the Tennessee Supreme Court stated that *Howell* did not provide for such a limitation. *Keen*, 398 S.W.3d at 603. Rather, the court in *Howell* instructed trial courts to "'giv[e] full and fair consideration to all tests administered to the petitioner'" and to "'fully analyz[e] and consider[ ] all evidence presented' concerning the petitioner's IQ." *Id.* (quoting *Howell*, 151 S.W.3d at 459).

The Tennessee Supreme Court stated in *Coleman* that its review of all cases involving the application of Tennessee Code Annotated section 39-13-203 reflected that "the parties and the courts have not been limiting their consideration of whether a criminal defendant has a 'functional intelligence quotient of seventy (70) or below' to the defendant's raw I.Q. test scores." *Coleman*, 341 S.W.3d at 247. The court explained:

> For example, in *Cribbs v. State*, both the State and Mr. Cribbs presented evidence that his raw I.Q. test scores did not accurately reflect his actual I.Q. On behalf of the State, Dr. Wyatt Nichols stated that Mr. Cribbs's intellectual level was actually higher than the I.Q. test score of 73 and was "[m]ore like the mid to high 80s." *Cribbs v. State*, 2009 WL 1905454, at *22, *32. Dr. Pamela Auble, appearing for Mr. Cribbs, stated in her initial report that his I.Q. was between 71 and 84. *Cribbs v. State*, 2009 WL 1905454, at *17. However, Dr. Auble later revised her opinion based on information obtained after her first report and concluded that Mr. Cribbs's I.Q. was below seventy. *Cribbs v. State*, 2009 WL 1905454, at *17. Based on all the evidence, the trial court concluded that the I.Q. test that produced the score of 73 was the most reliable. The trial court found that Dr. Auble's explanation for the change in her opinion was not credible

-15-

and that Dr. Nichols's testimony was persuasive. *Cribbs v. State*, 2009 WL 1905454, at *32.

> The consideration of I.Q. test scores in *Cribbs v. State* is but one example of cases in which the State has argued and presented evidence that scores on I.Q. tests should not be considered on their face value. *See also State v. Strode*, 232 S.W.3d [1, 5 (Tenn. 2007)] (the State presented evidence challenging the score on the basis that the defendant had been malingering); [*Leonard Edward*] *Smith v. State*, 2010 WL 3638033, at *30 (the State presented evidence that the defendant's I.Q. test score should be discounted because of malingering); *Van Tran v. State*, 2006 WL 3327828, at *4-6 (the State argued that the Vietnamese-born defendant's low I.Q. test score reflected cultural and linguistic bias).

*Id.* The Tennessee Supreme Court concluded that these cases reflected "the parties' and the courts' existing awareness that, as a practical matter, a criminal defendant's 'functional intellegence quotient' cannot be ascertained based only on raw I.Q. scores." *Id.* The court further concluded that the cases also reflected "the parties' conclusion that Tenn. Code Ann. § 39-13-203(a) does not prevent them from presenting relevant and competent evidence, either to prove or to disprove that the defendant's 'functional intelligence quotient' when the crime was committed was 'seventy (70) or below.'" *Id.* at 247-48.

In *Hall v. Florida*, 134 S. Ct. 1986 (2014), the United States Supreme Court held that Florida courts' interpretation of the significantly subaverage intellectual functioning provision in Florida's intellectual disability statute was unconstitutional. Florida courts interpreted the statute as requiring a strict raw I.Q. test score of 70 without consideration of the standard error of measurement. *Hall*, 134 S. Ct. at 1995-2000. The Supreme Court agreed "with the medical experts that when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." *Id.* at 2001. Unlike the defendant in *Hall*, the Petitioner in the present case was not precluded during his original trial or during the post-conviction proceedings from presenting evidence in addition to his raw IQ test scores to establish that his "functional intelligence quotient" was 70 or below at the time of the murder.

Contrary to the Petitioner's claims, the information in the affidavits of Drs. Watson and Greenspan was available prior to *Coleman*. Prior to the release of *Coleman* in 2011, Dr. Watson concluded in 2010 that the Petitioner was intellectually disabled. Dr. Watson's 2010 report did not indicate any restrictions in Tennessee law that precluded such a finding. At the trial and the post-conviction proceedings, the Petitioner

could have presented relevant and competent evidence, in addition to his raw IQ test scores, to establish that his "functional intelligence quotient" at the time of the murder was "seventy (70) or below."

More than seven years after Dr. Cantrell testified during the post-conviction proceedings, the Petitioner filed a petition seeking to present testimony from mental health experts whose opinions differed from those of Drs. Young and Cantrell. The information upon which Drs. Watson and Steinberg relied was available to the Petitioner at the time of the trial and the post-conviction proceedings. The new IQ testing by Dr. Watson was cumulative to the evidence that was previously available to the Petitioner. *See Wlodarz*, 361 S.W.3d at 499 (stating that newly discovered evidence that is merely cumulative to the evidence previously available does not warrant the issuance of a writ); *see also Vincent Sims*, 2014 WL 7334202, at *11 (holding that new IQ testing relied upon as evidence of intellectual disability was merely cumulative to the evidence previously available to the petitioner); *Tyrone Chalmers*, 2014 WL 2993863, at *11 (same); *Dennis Wade Suttles*, 2014 WL 2902271, at *17 (same).

The Petitioner argues that he did not present evidence establishing intellectual disability during post-conviction proceedings due to post-conviction counsel's ineffectiveness. "'[T]here is no constitutional right to effective assitance of counsel in post-conviction proceedings.'" *Stokes v. State*, 146 S.W.3d 56, 60 (Tenn. 2004) (quoting *House v. State*, 911 S.W.2d 705, 712 (Tenn. 1995)). Even if a constitutional right did exist, ineffective assistance of counsel is not an appropriate ground for coram nobis relief. *See Mindy Dodd v. State*, No. M2013-02385-CCA-R3-ECN, 2014 WL 1605168, at *3 (Tenn. Crim. App. Apr. 22, 2014), *perm. app. denied* (Tenn. Aug. 29, 2014) (holding that the petitioner's claims of ineffective assistance of trial counsel is not an appropriate ground for coram nobis relief). A claim of ineffective assistance of counsel does not justify tolling the statute of limitations for coram nobis relief. Moreover, "a petitioner's own fresh understanding of the law is not newly discovered evidence." *Philander Butler v. State*, No. W2012-01512-CCA-R3-CO, 2013 WL 1282313, at *5 (Tenn. Crim. App. Mar. 28, 2013).

We note that the Tennessee Supreme Court recently granted an application for permission to appeal in *Pervis Tyrone Payne v. State*, in which this court upheld the trial court's denial of coram nobis relief by a capital defendant who claimed intellectual disability. *Pervis Tyrone Payne v. State*, No. W2013-01248-CCA-R3-PD, 2014 WL 5502365, at *1 (Tenn. Crim. App. Oct. 30, 2014), *perm. app. granted* (Tenn. Feb. 13, 2015). The circumstances in *Pervis Tyrone Payne* are distinguishable from the instant appeal. The petitioner's trial in *Payne* occurred in 1988, but Tennessee Code Annotated section 39-13-203 was enacted in 1990 and did not apply retroactively. *Id.* at *13. The petitioner's post-conviction proceedings concluded in 1996, but our supreme court did

not recognize the unconstitutionalty of executing intellectually disabled defendants until 2001. *Id.* Unlike the petitioner in *Payne*, the Petitioner in the present case litigated the intellectual disability issue before the trial and during the post-conviction proceedings.

The facts and circumstances presented in the case are similar to cases in which this court has upheld the denial of coram nobis relief and our supreme court has denied applications for permission to appeal. In *Tyrone Chalmers*, the trial occurred in 1997, and the petitioner raised an intellectual disability claim in his amended post-conviction petition but later abandoned the issue. *Tyrone Chalmers*, 2014 WL 2993863, at *8. In *Dennis Wade Suttles*, the trial occurred in 1997, and the petitioner raised an intellectual disability claim in the amended post-conviction petition. *Dennis Wade Suttles*, 2014 WL 2902271, at *14. In *Vincent Sims*, the trial occurred in 1998, and the petitioner did not raise an intellectual disability claim during his post-conviction proceedings. *Vincent Sims*, 2014 WL 7334202, at *9-10. In each case, this court concluded that the evidence each petitioner relied upon in their respective coram nobis petition was available for presentation during each petitioner's post-conviction proceedings. *Id.* at *11; *Tyrone Chalmers*, 2014 WL 2993863, at *10-11; *Dennis Wade Suttles*, 2014 WL 2902271, at *17. We note that the Tennessee Supreme Court denied the petitioner's application for permission to appeal in *Vincent Sims* on May 18, 2015, after it had granted permission to appeal in *Pervis Payne*.

Even if *Coleman* provides a new ground for relief, the Petitioner did not file his petition for a writ of error coram nobis until February 2013, almost twenty-two months after *Coleman* was filed. The Petitioner's coram nobis petition does not relate to his motion to reopen his post-conviction petition filed in April 2012. "No statute in Tennessee nor tolling rule developed at common law provides that the time for filing a cause of action is tolled during the period in which a litigant pursues a related but independent cause of action." *Harris*, 301 S.W.3d at 146. The Petitioner chose not to file a petition for a writ of error coram nobis when he filed a motion to reopen his post-conviction proceedings. It was only after the Tennessee Supreme Court rejected in *Keen* the arguments upon which the Petitioner relied in his motion to reopen that he filed a petition for a writ of error coram nobis. A petitioner may not delay presenting a claim seeking coram nobis relief until "every other avenue of relief ha[s] been exhausted." *Billy Ray Irick v. State*, No. E2010-02385-CCA-R3-PD, 2011 WL 1991671, at *18 (Tenn. Crim. App. May 23, 2011), *perm. app. denied* (Tenn. Aug. 25, 2011).

We conclude that under the circumstances of this case, the delay in seeking coram nobis relief was unreasonable. *See Vincent Sims*, 2014 WL 7334202, at *12 (concluding that the twenty-month delay in filing a petition for a writ of error coram nobis following the release of *Coleman* was unreasonable); *Tyrone Chalmers*, 2014 WL 2993863, at *11 (holding that the twenty-two-month delay in filing a petition for a writ of error coram

nobis following the release of *Coleman* was unreasonable); *Dennis Wade Suttles*, 2014 WL 2902271, at *18 (concluding that the twenty-one-month delay in filing a petition for a writ of error coram nobis following the release of *Coleman* was unreasonable). *See generally Terry Lynn King v. State*, No. E2014-01202-CCA-R3-ECN, 2015 WL 3409486 (Tenn. Crim. App. May 28, 2015).

We conclude that the Petitioner's petition was barred by the one-year statute of limitations and that due process does not require tolling of the statute of limitations. Accordingly, the Petitioner is not entitled to coram nobis relief.

## II.  AUDITA QUERELA CLAIM

The Petitioner asserts that the trial court erred in denying his petition for a writ of audita querela.  A writ of audita querela is a "common law writ affording 'relief to a judgment debtor against a judgment or execution because of some defense or discharge arising subsequent to the rendition of the judgment or the issue of the execution.'" *Dwight Seaton v. State*, No. E1999-01312-CCA-R3-CD, 2000 WL 1177462, at *3 (Tenn. Crim. App. Aug. 21, 2000) (quoting *United States v. Fonseca-Martinez*, 36 F.3d 62, 64 (9th Cir. 1994) (citation omitted)).  The Tennessee Supreme Court has concluded that the writ of audita querela "is absolutely unknown and obsolete in the practice of this State." *Marsh v. Haywood*, 25 Tenn. 210, 1845 WL 1897, at *1 (Tenn. 1845).  Furthermore, Tennessee Code Annotated section 27-8-102 (2000) reflects that the writ of audita querela is obsolete by providing that the statutory writ of certiorari lies "[i]nstead of audita querela[.]"  Accordingly, the Petitioner is not entitled to relief on this basis.

## III.    DECLARATORY JUDGMENT

The Petitioner next contends that the trial court erred in denying his request for a declaratory judgment with respect to his intellectual disablity and double jeopardy claims. Tennessee Code Annotated section 29-14-102(a) (2012) provides that "[c]ourts of record within their respective jurisdictions have the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed[.]"  Section 29-14-103 (2012) provides:

> Any person . . . whose rights, status, or other legal relations are affected by a statute, municipal ordinancy, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franschise and obtain a declaration of rights, status or other legal relations thereunder.

The State, however, asserts that the Petitioner's claims are barred by the doctrine of sovereign immunity. Article I, section 17 of the Tennessee Constitution provides, "Suits may be brought against the State in such manner and in such courts as the Legislature may by law direct. The traditional construction of the clause is that suits cannot be brought against the State unless explicitly authorized by statute." *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 849 (Tenn. 2008). Tennessee Code Annotated section 20-13-102 (2009) further provides: "No court in the state shall have any power, jurisdiction, or authority to entertain any suit against the state, or against any officer of the state acting by authority of the state, with a view to reach the state, its treasury, fund, or property. . . ."

The Petitioner contends that the State waived the issue of sovereign immunity by failing to raise it in the trial court. Nevertheless, sovereign immunity may only be explicitly waived or held inapplicable. *See Colonial Pipeline Co.*, 263 S.W.3d at 853. Neither exception applies in this case because the declaratory judgment action was not raised as a facial constitutional challenge to enjoin a state official from enforcing an unconstitutional statute. *See id.*; *see also Suttles*, 2014 WL 2902271, at *19 (concluding that the doctrine of sovereign immunity barred the petitioner's declaratory judgment action against the State in which he alleged that he was precluded from the death penalty because of an intellectual disability). Accordingly, the Petitioner is not entitled to relief on this basis.

## IV. "*BIVENS*-LIKE" CLAIMS

The Petitioner asserts that the trial court erred in denying his claims of intellectual disability and violation of double jeopardy principles pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). In the absence of a federal statute providing for damages against a federal employee for violating the United States Constitution, the United States Supreme Court in *Bivens* recognized a limited, implied cause of action by a private citizen against federal employees for egregious violations of the Fourth Amendment. *See Bivens*, 403 U.S. at 390. The Supreme Court provided for a judicially-created damages remedy, concluding that the plaintiff would otherwise have no remedy for an unconstitutional invasion of his rights by federal agents. *Id.* Thus, "*Bivens* established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right." *Carlson v. Green*, 446 U.S. 14, 18 (1980).

Both the trial court and the Petitioner correctly recognize that Tennessee courts have not expanded *Bivens* to include an implied cause of action against the State or a State official based on a violation of Tennessee law. Furthermore, *Bivens* provides for an

implied cause of action for monetary damages. *See Bivens*, 403 U.S. at 397. The Petitioner, however, seeks to invalidate his death sentence, a remedy not recognized by *Bivens*. Finally, the Petitioner had several opportunities to litigate the issues of intellectual disability and double jeopardy. He raised the issue of intellectual disability before the trial in a limited manner and during the post-conviction proceedings. He also raised the double jeopardy issue in the appeal of his convictions before this court. This court held that the Petitioner waived the issue by failing to cite to the record or to any authority to support his claim. *See James Henderson Dellinger*, 2001 WL 220186, at *43. Accordingly, the Petitioner is not entitled to relief on this basis.

The Petitioner also asserts that the intellectual disability provisions in Tennessee Code Annotated section 39-13-203 provide an independent cause of action allowing him to challenge his eligibility for the death penalty. In construing a statute, this court must ascertain and give effect to the legislative intent without unduly restricting or expanding the statute beyond its intended scope. *State v. Strode*, 232 S.W.3d 1, 9 (Tenn. 2007). The words in the statute must be given their natural and ordinary meaning in light of their statutory context. *Keen*, 398 S.W.3d at 610. "[A]ny forced or subtle construction that would limit or extend the meaning of the language" must be avoided. *Id.* (citation omitted). "If the statutory language is clear and unambiguous, we apply the statute's plain language in its normal and accepted use." *Id.*

Tennessee Code Annotated section 39-13-203 provides the elements of intellectual disability, the burden of proof, and the procedure employed when the issue is raised in the trial court. The plain language of the statute, however, does not create an independent cause of action whereby a defendant may challenge his or her eligibility for the death penalty. *Vincent Sims*, 2014 WL 7334202, at *12; *Tyrone Chalmers*, 2014 WL 2993863, at *12; *Dennis Wade Suttles*, 2014 WL 2902271, at *20. If the General Assembly had intended to create a separate and independent cause of action to challenge eligibility for the death penalty on the basis of intellectual disability, it would have stated so in the statute. *See, e.g.*, T.C.A. § 40-30-301, et seq. (2012) (providing for a cause of action to allow certain defendants to request DNA testing of evidence). Accordingly, the Petitioner is not entitled to relief regarding this issue.

## V. OPEN COURTS, DUE PROCESS, AND LAW OF THE LAND CLAIMS

The Petitioner maintains that he is entitled to a hearing on his claims relative to intellectual disability and double jeopardy violations pursuant to the Open Courts Clause of Article I, section 17 of the Tennessee Constitution, the due process provisions in the Fifth and Fourteenth Amendments of the United States Constitution, and the law of the land provision in Article I, section 8 of the Tennessee Constitution.

## A. Open Courts

Article I, section 17 of the Tennessee Constitution provides: "That all courts shall be open; and every man, for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial, or delay." In interpreting this provision, our supreme court has stated:

> The obvious meaning of this is that there shall be established courts proceeding according to the course of the common law, or some system of well established judicature, to which all of the citizens of the state may resort for the enforcement of rights denied, or redress of wrongs done them.

*Staples v. Brown*, 85 S.W. 254, 255 (Tenn. 1905); *see State ex rel. Herbert S. Moncier v. Nancy S. Jones*, No. M2012-01429-COA-R3-CV, 2013 WL 2492648, at *6 (Tenn. App. June 6, 2013), *perm. app. denied* (Tenn. Nov. 13, 2013). This provision "does not create a right but, rather, requires a mechanism by which a citizen may redress grievances." *State ex rel. Herbert S. Moncier*, 2013 WL 2492648, at *6. Accordingly, Article I, section 17 does not create a substantive cause of action to enforce other constitutional provisions or laws. *Id.* The Petitioner may not rely upon the Open Courts Clause as a means to obtain a hearing on his intellectual disability and double jeopardy claims.

The Petitioner asserts that the procedural bars to a hearing on his intellectual disability and double jeopardy claims violate the Open Courts Clause. We note that the Petitioner is barred from filing a second petition for post-convition relief pursuant to Tennessee Code Annotated section 40-30-102(c). This court previously held that the Petitioner failed to meet the requirements provided in Code section 40-30-117(a) (2012) for reopening his post-conviction petition. The Petitioner's petition for a writ of error coram nobis is barred by the one-year statute of limitations provided in section 27-7-103 (Supp. 2012).

These procedural bars were enacted by the legislature. The Open Courts Clause "has been interpreted . . . as a mandate to the judiciary and not as a limitation upon the legislature." *Harrison v. Schrader*, 569 S.W.2d 822, 827 (Tenn. 1978) (citing *Scott v. Nashville Bridge Co.*, 223 S.W. 844 (Tenn. 1920)). The Petitioner maintains that *Scott* is no longer valid and should be overruled. As an intermediate appellate court, however, we may not overrule law determined by the Tennessee Supreme Court. Rather, we conclude that the procedural bars to a hearing do not violate the Open Courts Clause of the Tennessee Constitution. The Petitioner is not entitled to relief on this basis.

## B. Due Process and Law of the Land Claims

The Petitioner contends that the constitutional guarantees of substantive and procedural due process require that a mechanism by which he may present his intellectual disability and double jeopardy claims. He also contends that these constitutional guarantees require any failure to comply with the procedural rules be excused due to his "substantial limitations" and the existence of extraordinary circumstances. The Petitioner relies upon *Whitehead v. State*, 402 S.W.3d 615 (Tenn. 2013), to support his claims. We note that the Petitioner did not raise the issue of whether due process requires a mechanism to present his claims in his "Second Amended Motion to Reopen and Additional Claims for Relief." Nevertheless, the Petitioner is not entitled to relief.

In *Whitehead*, the supreme court concluded that a petition for post-conviction relief is entitled to due process tolling of the statute of limitations based upon the conduct of the petitioner's attorney when (1) the petitioner had been deligently pursuing his or her rights and (2) extraordinary circumstances prevented the timely filing of the petition. *Whitehead*, 402 S.W.3d at 631. Counsel in *Whitehead* erroneously advised the petitioner of the deadline for filing a pro se post-conviction petition and failed to deliver promptly to the petitioner the litigation files necessary to prepare the petition. *Id.* at 632-33. The court held that the combination of these circumstances prevented the petitioner from filing a timely post-conviction petition and required due process tolling of the statute of limitations. *Id.*

As this court recognized in its order denying the Petitioner's application for permission to appeal the post-conviction court's denial of his motion to reopen, *Whitehead* is distinguishable from the present case. *See James Dellinger v. State*, No. E2013-02079-CCA-R28-PD (Tenn. Crim. App. Jan. 16, 2014) (order), *perm. app. denied* (Tenn. May 15, 2014). The Petitioner in the present case was not prevented from filing a post-conviction petition due to attorney misconduct or misrepresentation. Rather, the Petitioner raised his intellectual disability claim in his post-conviction petition, but the testimony of his mental health expert during the hearing did not support his claim. The Petitioner also unsuccessfully raised the double jeopardy issue in this court in the appeal of his conviction. The Petitioner argues that, due to extraordinary circumstances in the form of ineffective assistance of post-conviction counsel, he should be permitted to raise both claims again. However, as the supreme court recognized in *Whitehead*, there is no right to the effective assistance of counsel in post-conviction proceedings. *Whitehead*, 402 S.W.3d at 625 n.10 (citing *Stokes*, 146 S.W.3d at 57, 60-61). The Petitioner is not entitled to relief on this basis.

# CONCLUSION

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.


_____
ROBERT H. MONTGOMERY, JR., JUDGE